JUDE G. GRAVOIS, Judge.
|gThe succession of plaintiff, Alice Rooney Schindler, appeals a trial court judgment finding that certain donations inter vivos made by Mrs. Schindler’s late husband, Charles V. Schindler, allegedly from their community property, were remunerative in nature, thus denying her request to nullify the donations. For the reasons that follow, we affirm.

PROCEDURAL BACKGROUND

In 2003, before her death, Alice Rooney Schindler filed suit against her husband, Charles V. Schindler, for separation of property in order to stop him from spending their community funds without her consent and to separate the remainder of their property.[1] She later amended her suit to include as defendants several persons to whom Mr. Schindler gave money. Mr. Schindler died in 2004 during the pen-dency of the suit. Mrs. Schindler died in 2007; her succession was ^thereupon substituted as party-plaintiff.[2] The defendants who went to trial were Cindy Moore and Trudy Davis. After a two-day bench trial, the trial court rendered judgment in favor of Ms. Moore and Ms. Davis, dismissing plaintiffs claims against them with prejudice at plaintiffs costs. Following the denial of plaintiffs motion for a new trial, plaintiff appealed the judgment only as to Ms. Moore.

ASSIGNMENTS OF ERROR

On appeal, plaintiff argues the following assignments of error, to-wit:
1. The Trial Court erred in not placing the burden of proof on the defendant Trudy Davis to prove that the donation in question was remunerative.

2. The Trial Court erred in finding that the donation in question was remunerative.

3. The Trial Court erred in finding that the funds donated to Trudy Davis were separate funds of Charles Schindler, and not community property with Mrs. Schindler.
4. The Trial Court erred in finding that the amount of $111,000.00 donated by Mr. Schindler to Ms. Davis was a “usual and customary amount”, which did not require the consent of Mrs. Schindler.

FACTS

The record and the briefs show that Mr. and Mrs. Schindler were married in 1951. They had seven sons together and lived in New Orleans. Sometime around 1964, they began living separate and apart, though they never sought a formal legal separation, divorce, or separation of property until Mrs. Schindler’s suit in 2003.
As found by the trial court, the record reflects that the parties were relatively wealthy. Mr. Schindler received a large personal injury settlement in the 1970s, which he invested in stocks that apparently performed very well. Mrs. Schindler | testified in her deposition[3] that the stock *441 was ultimately converted to municipal bonds in the 2000s, with two $500,000 bonds being placed in Mrs. Schindler’s name alone, and with three $500,000 bonds being placed in Mr. Schindler’s name alone. The parties also owned several other income-producing rental properties, as well as acreage (which included a “camp”) near Meadville, Mississippi. A CPA’s report entered into evidence shows that at the time of Mr. Schindler’s death, the community was valued at between $3.8 and $4.8 million. Evidence and testimony showed that Mr. and Mrs. Schindler were very generous with their wealth, making donations to various family members and Mends. As noted by the trial court in its reasons for judgment:
The Schindlers appear to have been very generous with their wealth. They bought houses for their son Jon, Anna Schindler (ex-daughter-in-law), and Cindy Moore (Charles’ god-daughter).... They purchased a car for their son Michael, and gave him the down payment for his home.... They helped their son Jon pay child support, and paid all of his expenses.... They paid tuition for two of their grandchildren, and helped Anna Schindler with tuition at Tulane University. ... They donated a municipal bond in the amount of $500,000.00 to Anna Schindler, and gave $250,000.00 to Kip Briggs (Anna Schindler’s boyfriend).
Mrs. Schindler testified in her deposition that she “kept the books” for both herself and Mr. Schindler,[4] although if he wanted money, he would just “write himself a check.” She agreed that they each had money that they could spend without the other’s permission, although she testified that when she bought a house for Anna Schindler, her ex-daughter-in-law with whom she lived and who provided her with physical care for an extended period of time, including after she suffered two strokes, she told Mr. Schindler about that purchase.
lsMr. Schindler in his later years suffered serious health problems as well, including cancer of the stomach or esophagus.[5] Because none of his children apparently desired or was able to provide care for him, he sought the services of defendants Trudy Davis and Cindy Moore, among others, as caregivers.[6] After being introduced to each other in late 1999, Ms. Davis began taking care of Mr. Schindler around January of 2000 until approximately June of 2003, according to her testimony. Mrs. Schindler alleged that Mr. Schindler gave Ms. Davis two checks totaling $9,000, plus an additional $102,000 for the purchase of a house, from their community property and to which she did not consent, although she admitted that he did tell her of his intent to fund Ms. Davis’ house purchase beforehand.

FIRST AND SECOND ASSIGNMENTS OF ERROR

Which party has the burden of proof of remunerative donations?

Did the trial court err in finding the donations remunerative?

Plaintiff first argues that the trial court erred in fading to place the burden of proof upon Ms. Davis that the donations to Ms. Davis were remunerative, not gratuitous. Plaintiff further argues that Ms. *442 Davis failed in her burden because the only evidence she presented was her own testimony, which was inadequate, and she failed to present evidence of a written contract between herself and Mr. Schindler for the payment of her services, proof of the time she spent caring for him or other records, or other witnesses who could corroborate her testimony regarding the amount and value of her services to Mr. Schindler. Plaintiff cites La. C.C. art. 1846, which states that an unwritten contract over $500 must be proven by at least one witness or other corroborating circumstances.
IfiMs. Davis responds that the trial court did, in fact, properly place the burden of proof upon her to show that the donations Mr. Schindler to her were remunerative, and further argues that her testimony was enough to bear her burden of proof, because plaintiffs claims are not controlled by La. C.C. art. 1846, as that article pertains to contracts not reduced to writing, not donations.
The trial court, in its reasons for judgment, characterized plaintiffs claim as one to nullify the donations made to Ms. Davis because the donations were not usual and customary gifts of a value commensurate with the economic situation of the Schin-dlers, and because she did not consent to the donations.
In its reasons for judgment, the trial court found that plaintiffs claim failed on several alternative grounds. First, the trial court found that, assuming the donations to Ms. Davis were gratuitous, they were of a value commensurate with the economic position of the spouses, and thus Mrs. Schindler’s consent was not required under La. C.C. art. 2349. Next, he found that the alleged donations were funded by Mr. Schindler’s separate property, and thus Mrs. Schindler’s consent was not required. Finally, he found that the donations to Ms. Davis were remunerative.
“The donation of community property to a third person requires the concurrence of the spouses, but a spouse acting alone may make a usual or customary gift of a value commensurate with the economic position of the spouses at the time of the donation.” La. C.C. art. 2349. “When the concurrence of the spouses is required by law, the alienation, encumbrance, or lease of community property by a spouse is relatively null unless the other spouse has renounced the right to concur.” La. C.C. art. 2353.
Ms. Davis testified that Mr. Schindler’s donations to her were in payment for services rendered. She said that she was introduced to Mr. Schindler in late 171999 by Mr. Schindler’s friend Keith Ingram, with whom he had served in the military. In early 2000, she said that Mr. Schindler told her his health was worsening and he asked her to start caring for him. She described that he had neck pain from a previous broken neck, as well as other serious ailments, including cancer. He told her that his family was either unable or unwilling to care for him. She said that she cared for him until June of 2003, or around three-and-a-half years. Ms. Davis described helping him on occasion with enemas and suppositories, as well as helping him with other medical care necessitated by bleeding caused by his stomach cancer. She would take him to the doctor, to the hospital, and to a pain management clinic. She accompanied him to Philadelphia to receive a procedure for his cancer, a trip that lasted three weeks.
Ms. Davis stated that she did not live with Mr. Schindler or have a particular schedule of care for him, but that she was “on-call” and that Mr. Schindler called her a lot. For some periods, she accompanied him every other weekend to his property *443 in Mississippi. Some of the weekend trips to Mississippi were three or four days long. She testified that at those times, the only family that would visit Mr. Schindler was his son Jon, who visited occasionally. Ms. Davis said besides her, she knew of others who were also caring for Mr. Schindler, including Anna Schindler, Cindy Moore, and occasionally Jon.
Ms. Davis testified that her agreement with Mr. Schindler was that she would be paid for caring for him. He proposed to pay her $13 per hour, but such payments were never made on that basis, and that he never paid her anything, except for the two checks totaling $9,000, and by buying her the house. She acknowledged receiving checks from Mr. Schindler for $4,000 on April 2, 2003 and $5,000 on November 22, 2003, and that he purchased a home for her in Pearl River, Louisiana, on June 9, 2003, as evidenced by a check from Mr. Schindler for 18$102,000 payable directly to the closing attorney. She stated that Mr. Schindler lived at her house for several weeks, after which he left and was thereafter cared for by others.
Ms. Davis stated that she eared for Mr. Schindler between 50 and 60 hours per week. On cross-examination, she agreed that Mr. Schindler was able to drive and did not spend all of his time with her, except for on the weekends she accompanied him to Mississippi. She agreed that he visited various family members and other people during that three-and-a-half year period she cared for him. She testified that although she did not keep track of her hours, Mr. Schindler did. She said that when they were together, including when she accompanied him to Mississippi, Mr. Schindler paid for all of their expenses, including food and meals.
Ms. Davis admitted that at the time she was caring for Mr. Schindler, she also worked at a store in the New Orleans French Quarter approximately 18-20 hours per week and also for Mr. Ingram approximately 20-30 hours per week at his office in Slidell. She said that she worked for Mr. Schindler after those two jobs, and that her job in the French Quarter was only about two days per week.
Ms. Davis testified that she used the two checks Mr. Schindler gave her (totaling $9,000) for household expenses and for some of Mr. Schindler’s expenses, including his medication expenses, and for insurance and reimbursement for expenses for running errands for him, including gas. Ms. Davis said that Mr. Schindler told her that he was a millionaire. She said that she was aware that he owned several properties in New Orleans, in addition to his property in Mississippi. She testified that he told her he had money separate from Mrs. Schindler, specifically three $500,000 municipal bonds. She noted that she had been present for Mrs. Schindler’s deposition in 2004, wherein Mrs. Schindler | described how she and Mr. Schindler got the two and three $500,000 bonds, respectively. Ms. Davis also agreed that Mrs. Schindler, in her deposition, stated that Mr. Schindler told her (Mrs. Schindler) that he intended to buy a house for Ms. Davis and. told her that Ms. Davis had provided care for him. She also agreed with counsel that Mrs. Schindler had stated in her deposition that if Ms. Davis had in fact provided care for Mr. Schindler, Mrs. Schindler agreed she should be paid for it.
Upon review, we find that the trial court correctly placed the burden of proof of the remunerative nature of the donations upon Ms. Davis, and that the trial court correctly found that she had met that burden. Though Jon Schindler testified that he thought Ms. Davis was running a “scam,” the trial court concluded that the evidence showed otherwise. We find that the rec *444 ord, taken as a whole, contains a rational basis for the trial court’s factual conclusion. Ms. Davis testified in detail regarding the time she spent with Mr. Schindler and what services she performed for him. Mrs. Schindler also noted in her deposition that Mr. Schindler had very serious medical problems during this time that required that he be cared for, and that she did not provide such care. Mrs. Schindler admitted that she was not around Mr. Schindler and Ms. Davis and thus did not know what Ms. Davis did for Mr. Schindler. Accordingly, we find no manifest error in the trial court’s factual conclusion in this regard. These assignments of error are without merit.

THIRD ASSIGNMENT OF ERROR

Were funds donated Mr. Schindler’s separate property?

Plaintiff next argues that the trial court erred in finding that Mr. Schindler made the donations to Ms. Davis out his separate property. Plaintiff argues that under La. C.C. art. 2340, the presumption in Louisiana is that marital property is community in nature. Plaintiff notes that a judgment of separation of property b nbetween the Schindlers was never rendered. She also argues that the parties had joint accounts at Schwab, and that their accounts pertaining to their real estate and rental properties were maintained in both names.
In its reasons for judgment, the trial court concluded that either the funds used to purchase the stock that later was cashed in for the five municipal bonds that Mr. and Mrs. Schindler had placed in their separate names was Mr. Schindler’s separate property because the stock was purchased with the proceeds from Mr. Schindler’s personal injury settlement; or alternatively, that even if those funds were to be considered community property, the Schindlers had nonetheless decided to treat those funds as separate property when they placed the stock proceeds in municipal bonds in their separate names, and thus Mr. Schindler did not need Mrs. Schindler’s consent to make donations from these funds.
Mrs. Schindler testified in her deposition that she and her husband were free to spend the money from the municipal bonds as they pleased. Thus, regardless of whether those funds were characterized as community or separate, upon review, we find no manifest error in the trial court’s conclusion that Mrs. Schindler’s consent was not required for Mr. Schindler to make donations from these funds to Ms. Davis. This assignment of error is also without merit.

FOURTH ASSIGNMENT OF ERROR

Were the funds donated a usual and customary amount ?

Lastly, Mrs. Schindler argues that the amount of funds donated to Ms. Davis was not a usual and customary amount. However, she argues merely that the amount was such, over $100,000, that no spouse should be able to give that amount away without the other spouse’s consent.
As noted above, the trial court included in its reasons for judgment a short recitation of some of the various donations made by the Schindlers, jointly or |nseparately. The amount of those donations, as noted above by the trial court, makes it clear that the donations totaling $111,000 made by Mr. Schindler to Ms. Davis were quite in line with, and were in fact less than, the very generous donations that the Schin-dlers made to others who were or were not their family members, and/or who provided or did not provide care to them. Under the particular facts and circumstances of this case, we agree with the trial court’s *445 finding that the amount of funds donated by Mr. Schindler to Ms. Davis was a usual and customary amount relative to the Schindlers. Accordingly, this assignment of error is without merit.

CONCLUSION

For the reasons stated herein, we find no merit to the assignments of error raised by plaintiff/appellant. Accordingly, the trial court’s judgment under review is hereby affirmed.

AFFIRMED.

. No judgment of separation of property was ever rendered, however.

. For ease of reference, plaintiff will be referred to as "plaintiff” or "she” rather than "the succession.”

. Mrs. Schindler’s deposition was taken in 2004 and was entered into evidence at trial in lieu of testimony because she was deceased by the time of trial.

. Prior to her retirement, Mrs. Schindler had an income tax return preparation business.

. Mr. Schindler's cancer was described as one or both in different places in the record.

.Because Ms. Moore is not a party in this appeal, details about her financial transactions with Mr. Schindler will not be discussed in this opinion.